**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

WILLIAM ROUSER,
    *Plaintiff-Appellant*,

v.

THEO WHITE; JAMES GOMEZ,
Director of Corrections; J. YATES;
P. ORTIZ, Correctional Counselor II;
B. FLORES, Correctional Counselor I;
BRIAN HAWS; BRENDA CASH;
MATTHEW CATE,
    *Defendants-Appellees.*

No. 13-56152

D.C. No.
2:11-cv-09123-
RGK-JEM

OPINION

Appeal from the United States District Court
for the Central District of California
R. Gary Klausner, District Judge, Presiding

Argued and Submitted June 4, 2015
Pasadena, California

Filed June 17, 2016

Before: Alex Kozinski and Consuelo M. Callahan, Circuit
Judges, and James K. Singleton,[*] Senior District Judge.

---

[*] The Honorable James K. Singleton, Senior District Judge for the U.S. District Court for the District of Alaska, sitting by designation.

Opinion by Judge Kozinski;
Dissent by Judge Callahan

**SUMMARY**[**]

**Consent Decree**

The panel vacated the district court's order terminating a consent decree, reinstated the 2011 consent decree between a California state prisoner and defendant prison officials concerning the prisoner's religious exercise of his Wiccan religion, and remanded for further proceedings.

The panel accorded no special deference in reviewing the district court's exercise of its discretion in terminating the consent decree where the district court had only supervised the litigation for two years of the twenty-year history of the case.

The panel held that the district court committed numerous errors in terminating the consent decree. Specifically, the panel held that the district court applied the wrong legal standard and found substantial compliance by the prison officials without giving due attention to the various exacting obligations embodied in the decree, and without considering whether the purpose of the decree had been served. The panel also held that the district court improperly refused to hold an evidentiary hearing to resolve material factual disputes about whether defendants had complied with the

**  This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

decree. The panel also held that the district court encouraged noncompliance by finding that defendants had violated the consent decree, yet the court refused to grant any meaningful relief. The panel concluded that the district court abused its discretion in terminating the consent decree.

The panel held that the prisoner's failure to receive the district court's orders prejudiced his ability to allege violations of the 2011 decree. The panel held that the district court's protracted failure to correct the pro se prisoner's address, and its repeated failure to re-send notices of orders that had been returned as undeliverable, raised due process concerns.

Judge Callahan dissented because the majority's reversal of the district court improperly denied the heightened deference due a trial court's finding that a consent decree aimed at institutional reform had served its purpose, was at odds with the Prison Litigation Reform Act, and was undermined by a record showing compliance that was substantial. Judge Callahan would also hold that the prisoner did not make a due process argument, and even if the district court made a due process error, the prisoner suffered no prejudice.

## COUNSEL

James M. Burnham (argued), Noel J. Francisco, Sarah A. Hunger and Kelsey A. Israel-Trummel, Jones Day, Washington, D.C., for Plaintiff-Appellant.

Maneesh Sharma (argued), Deputy Attorney General; Thomas S. Patterson, Supervising Deputy Attorney General; Jonathan L. Woff, Senior Assistant Attorney General; and Kamala Harris, Attorney General; California Department of Justice, San Francisco, California; for Defendants-Appellees.

## OPINION

KOZINSKI, Circuit Judge:

We consider the standards applicable to the termination of a consent decree on grounds of substantial compliance.

## BACKGROUND

William Rouser is a Wiccan. Despite Wicca's relative obscurity, Rouser was not its only adherent in the California State Prison at Sacramento. In 1992, he petitioned on behalf of himself and some thirty fellow Wiccan inmates that the prison recognize Wicca as a bona fide religion and afford its followers the same rights accorded to inmates of other faiths. Specifically, Rouser sought to (1) possess Wiccan ritual items like candles, incense and Tarot cards; (2) access *A Witches Bible Compleat* when placed in administrative segregation; (3) use the prison chapel for Wiccan ceremonies; and (4) receive the ministry of a Wiccan chaplain.

When the prison denied his requests, Rouser filed a civil rights complaint in the Eastern District of California. After District Judge Karlton set the matter for trial, the parties entered into a comprehensive settlement agreement (the "1997 Agreement"). The agreement applied to "any institution under the jurisdiction of the California Department of Corrections (CDC) to which [Rouser] is assigned" and described how the prisons and their staff would accommodate Rouser's religious needs.

Over the next 14 years, Rouser notified the court of various ways in which the CDC and its employees violated the terms of the 1997 Agreement in the three facilities where he was housed. Rouser alleged, for example, that officials suspended Wiccan services while permitting other religious services; precluded him from ordering religious items like candles, oil, incense and herbs; prevented inmates from timely attending Wiccan services; and disregarded his administrative complaints.

Judge Karlton eventually granted a preliminary injunction. In a 33-page order, he found that prison officials substantially burdened Rouser's religious exercise by "[i]nhibiting [his] timely receipt of religious articles" and "[i]nhibiting group worship." A year later, the parties entered into another settlement agreement, which the district court adopted as a consent decree ("2011 Decree") and is at the heart of this appeal. The decree reaffirmed the promises the CDC made in the 1997 Agreement and provided Rouser with additional privileges: He was allowed to possess listed religious items in his cell; he was entitled to attend weekly "esbats" and eight annual "sabbats" at an outdoor religious activity area; and CDC employees would "develop a procedure that allows the volunteer Wiccan minister . . . to

obtain access to Wiccan group worship articles in a timely manner for use at Wiccan esbats and sabbats." In addition, Rouser was permitted to bypass the informal, formal and first levels of appeal and file a second-level appeal directly with the warden or his designee to report any noncompliance with the 2011 Decree.

The decree provided that after one year, defendants could move for termination by showing that they had substantially complied with its terms. After approving the 2011 Decree, Judge Karlton transferred the case to the U.S. District Court for the Central District of California on the parties' motion.

Several months after the 2011 Decree went into effect, Rouser filed a motion to enforce its terms and asked for a preliminary injunction. He argued that officials violated the 2011 Decree in at least five ways: by damaging a religious necklace in their custody; by canceling and suspending Wiccan services without a legitimate justification; by prohibiting Rouser from using candles in his worship; and by failing to construct an outdoor religious worship area. Most significantly, Rouser alleged that they screened and disregarded his direct appeals to the warden. Defendants denied or attempted to justify some of their actions, but didn't contest Rouser's allegations that his appeals weren't being processed in accordance with the terms of the 2011 Decree. And they all but conceded that they violated the decree by denying Rouser access to candles.

The district court found that defendants had violated the 2011 Decree in two ways: by damaging the religious necklace and dismissing Rouser's grievances before they reached the warden. The court reminded defendants to "adhere to the terms of the Decree" but didn't order them to replace the

necklace or grant any other relief. The court found no willful violation of the provision permitting Rouser to use candles—only a temporary prohibition due to a miscommunication that was later resolved. As to the remaining claims, the district court faulted Rouser for failing to provide sufficient evidence to meet his burden of proving noncompliance. Rouser, however, had provided a sworn declaration, a prison memorandum and a statement under penalty of perjury from another inmate to support his claims that the prison had no justification for canceling and suspending Wiccan services. Defendants presented their own sworn statements contradicting Rouser's allegations, and the district court tacitly resolved the factual disputes in favor of defendants without an evidentiary hearing or even an acknowledgment that Rouser had presented contrary evidence.

Three months later, defendants moved to vacate the decree on grounds of substantial compliance. They relied on the declaration of Correctional Counselor Nathan Wilcox, who claimed that defendants "fully complied" with the 2011 Decree, but he discussed only some of its terms and said nothing about compliance with the other terms. *See infra* p. 12. Nor did he claim that defendants had remedied the two violations the court had found just three months earlier. Wilcox relied on an internal prison memorandum that set forth procedures for facilitating Wiccan group worship. But that memorandum was dated October 2012 and thus predated the district court's finding that defendants had frustrated Wiccan group worship by damaging the religious necklace and failing to give Rouser direct access to the warden for his grievances.

Rouser disputed that the prison complied with the 2011 Decree and sought an evidentiary hearing, claiming that he'd

recently been prevented from ordering candles and incense. In their reply, defendants maintained that Rouser failed to "articulate any legitimate basis for extending this Court's . . . 2011 Order," and asked the court to deny the motion without a hearing or oral argument.

The court complied. It concluded in a minute order that "[d]efendants have demonstrated by a preponderance of the evidence that they have substantially complied with the terms of the settlement agreement." The court didn't mention its earlier finding that defendants had violated the 2011 Decree. Rather, the court found that Wilcox's declaration and the outdated prison memo showed defendants took "*significant steps* to follow the settlement agreement" (emphasis added). Finding this sufficient to show substantial compliance, the court concluded that Rouser's allegations of noncompliance, even if assumed to be true, were "insufficient to render Defendants substantially non-compliant" with the 2011 Decree.

## DISCUSSION

We review for abuse of discretion the district court's decision to terminate a consent decree. *See Jeff D.* v. *Otter* (*Otter*), 643 F.3d 278, 283 (9th Cir. 2011) (citing *Jeff D.* v. *Kempthorne* (*Kempthorne*), 365 F.3d 844, 850 (9th Cir. 2004)). We apply heightened deference to the district court's discretionary decisions where it "has been overseeing complex institutional reform litigation for a long period of time." *Kempthorne*, 365 F.3d at 850. Here, however, the court that vacated the consent decree had supervised it for only two years of the twenty-year history of the case. Neither our cases nor the PLRA require deference to a district court simply because it has managed institutional-reform litigation

for two years. The dissent identifies no authority to the contrary. Diss. at 33–34. Thus, we accord no special deference in reviewing its exercise of discretion.

## I. Purpose and History of the 2011 Decree

Our case law instructs district courts deciding a motion to vacate a consent decree to first consider "the more general goals of the decree." *Otter*, 643 F.3d at 288 (quoting *Youngblood* v. *Dalzell*, 925 F.2d 954, 960 (6th Cir. 1991)). Then the court should examine defendants' entire "record of compliance." *Id.* (quoting *Freeman* v. *Pitts*, 503 U.S. 467, 491 (1992)). We have reversed a district court's termination of a consent decree for failing to explicitly consider the "goals of the decree[]" and only evaluating compliance with individual action items. *Id.* at 289.

The district court overlooked the teachings of *Otter*. Nowhere in its terse minute order did it mention the defendants' record of compliance—either with the 2011 Decree or its predecessor—"which over the course of the litigation has been far from exemplary." *Id.* at 288. Nor did it analyze whether the purposes of the 2011 Decree had been "adequately served" by defendants. *Id.* at 289.

The dissent claims that the district court identified the purpose of the decree by explaining that Rouser initially brought suit for, and entered into a settlement that governs, his "right to practice his religion, Wicca." *See* Diss. at 38. But these passing observations don't satisfy *Otter*'s requirement that a district court give "[e]xplicit consideration [to] the goals of the decree[]." 643 F.3d at 289. Nor do they comply with *Otter*'s requirement that the district court find

that "those goals have been adequately served" before vacating the decree. *Id.*

This alone provides sufficient grounds for reversing the order vacating the decree. *Id.* But there's much more. Because the case must be returned to the district court, we note numerous other errors so that they will not be repeated on remand.

## II. Substantial Compliance

### A. Definition

The district court didn't evaluate whether defendants substantially complied with each of the 2011 Decree's terms. Instead, it concluded that they "complied with the [2011 Decree]" as a whole. As such, it abused its discretion by applying law incorrectly. *Id.* at 283. Our cases do not treat consent decrees as monolithic commands with which defendants either comply or not. "Without question courts treat consent decrees as contracts," *United States* v. *Asarco, Inc.*, 430 F.3d 972, 980 (9th Cir. 2005), that have "the additional element of judicial approbation." *Smith* v. *Sumner*, 994 F.2d 1401, 1406 (9th Cir. 1993). Like terms in a contract, distinct provisions of consent decrees are independent obligations, each of which must be satisfied before there can be a finding of substantial compliance. Accordingly, courts don't release parties from a consent decree unless they have substantially complied with *every one* of its provisions.

In *Hallett* v. *Morgan* we affirmed the district court's ruling that a prison substantially complied with the specific provisions of a consent decree requiring the facility to

provide proper mental health and dental services to inmates. 296 F.3d 732, 749–50 (9th Cir. 2002). At the same time, we reversed its determination that the prison substantially complied with the "other medical care provisions" of the decree. *Id.* at 750–51. We also tacitly endorsed the *Otter* district court's approach of separately evaluating whether defendants complied with individual "Action Items" in a consent decree. *Otter*, 643 F.3d at 285; *see also Washington* v. *Penwell*, 700 F.2d 570, 572 (9th Cir. 1983) (remanding to district court for failing to analyze compliance with one of several obligations in a consent decree).

The district court thus erred by applying the wrong legal standard for substantial compliance. The court was satisfied that the decree had been complied with because defendants had taken "significant steps to follow the settlement agreement." *See supra* p. 8. But merely taking significant steps toward implementing the decree falls far short of "substantial compliance." While the term is not amenable to a "mathematically precise definition," *Otter*, 643 F.3d at 284 (quoting *Joseph A.* v. *N.M. Dep't of Human Servs.*, 69 F.3d 1081, 1085 (10th Cir. 1995)), state law gives it meaning. *Id.* And in California a party is deemed to have substantially complied with an obligation only where any deviation is "unintentional and so minor or trivial as not 'substantially to defeat the object which the parties intend to accomplish.'" *Wells Benz, Inc.* v. *United States*, 333 F.2d 89, 92 (9th Cir. 1964) (quoting *Connell* v. *Higgins*, 150 P. 769, 775 (Cal. 1915)).

This standard doesn't require perfection, contrary to what the dissent suggests. Diss. at 36. Deviations are permitted so long as they don't defeat the object of the decree. But merely taking significant steps toward compliance comes nowhere

near satisfying this exacting standard. Rather, the district court should have first found that defendants substantially complied with each of the decree's terms for a substantial period before terminating the decree.

## B. Application

The record did not contain sufficient evidence to permit the district court to conclude that defendants met the substantial-compliance standard. For one, the district court had found, just four months earlier, that defendants had *not* complied with provisions related to custody over group worship supplies and expedited administrative appeals. Wilcox says nothing in his declaration to indicate that defendants had remedied these defects. Given this uncontested record of violations and the absence of any evidence that the deficient performance had been remedied, the district court's conclusion that there has been substantial compliance rested on a "clearly erroneous finding of material fact." *Otter*, 643 F.3d at 283 (quoting *Casey* v. *Albertson's Inc.*, 362 F.3d 1254, 1257 (9th Cir. 2004)).

More significant still, defendants failed to establish altogether that they complied with several action items in the 2011 Decree. For example, defendants agreed to make copies of a master schedule of religious services that included the time and location of Wiccan events. Nothing in the record documents that they fulfilled this obligation. And what of Rouser's ability to access his Wiccan bible in administrative segregation? Or his right to be released from confinement in time to attend full Wiccan services? We don't know, because defendants presented no evidence and the district court made no findings as to these terms of the 2011 Decree. There is no indication that the district court was aware of these terms

when it entered its order. Yet a consent decree may not be terminated without well-supported findings that all of its terms have been faithfully complied with for a substantial period.

The dissent doesn't explain how defendants could possibly show substantial compliance with all key obligations in a consent decree by only complying with some of those obligations. Nor does it explain how Rouser could "concede[]" that defendants complied with decree provisions that weren't mentioned in their motion to vacate. Diss. at 42. The dissent relies on stale documents—the 2012 internal prison memorandum and a year-old joint status report—to support its claim that the prison was complying with all decree provisions in 2013. Diss. at 45–46. That's inconsistent with our caselaw requiring courts to examine the "record reflecting [prison] conditions as of the time termination is sought." *Gilmore* v. *California*, 220 F.3d 987, 1010 (9th Cir. 2000). It's also at odds with the dissent's own warning that "past instances of non-compliance are of questionable relevance in deciding whether to vacate a consent decree." Diss. at 46.

In addition to these gaps in the record, the district court overlooked those of defendants' claims that Rouser disputed. Specifically, Rouser alleged that he was only allowed one ritual outdoors. And he claimed that he wasn't allowed to use the seven candles specified in the 2011 Decree or obtain incense—both of which were important components of outdoor group worship. Where there is a factual dispute about whether defendants substantially complied with a decree, the district court may not simply "examine the [existing] record for 'findings.'" *Gilmore*, 220 F.3d at 1010. Rather, the court must take evidence on the current conditions

at the prison. *Id.* As the dissent acknowledges, the district court didn't follow this rule, even though Rouser contested "two relevant instances" of defendants' compliance. Diss. at 41–42. The defendants' alleged failures weren't merely "trivial" deviations warranting a finding of substantial compliance. *Connell*, 150 P. at 775. If true, Rouser's allegations would have documented material *non*compliance with the terms of the decree and thus precluded any finding of substantial compliance. Accordingly, the district court should have—but didn't—conduct a hearing before deciding material factual disputes related to defendants' compliance with the decree.

## III. Denial of Due Process

The district court terminated the 2011 Decree at a time when Rouser wasn't receiving notice of its orders. The court had granted Rouser's request to proceed pro se on March 28, 2012 and had recorded his address as the California State Prison, Los Angeles County, in Lancaster. However, the docket was not updated to reflect the address change, and the court continued to send its orders to Rouser's former counsel—almost two dozen over the course of two years. Each of those was returned to the district court as undeliverable.[1] Once back, a deputy clerk dutifully filed and

---

[1] Although the court substituted Rouser for a few of his attorneys when it granted his request to proceed pro se, the docket continued to show that Rouser was being represented by attorney Richard Bates. Rouser had retained Bates in 2004 to represent him during his proceedings in the Eastern District of California. Although Bates withdrew as counsel in 2006, he was not removed as counsel of record until after Rouser filed his appeal. The dissent claims that the withdrawal was conditioned on Rouser filing a separate order, which he never did. Diss. at 48. But the district court's minute entry indicates that Bates was dismissed even absent the

docketed them. *See Appendix A*. But nobody bothered to correct the service address or resend the court's orders to Rouser in prison.

Rouser wrote to the court on October 27, 2012, explaining that he was "pro per and the only way he has been finding out about the [court's] hearing dates is from the response filing of the defendants." If anyone read this statement on the first page of Rouser's pleading, nobody bothered to find out why Rouser was not getting the court's orders or implement the address change. The court's orders continued to be sent to—and immediately returned from—Rouser's former attorney's address.

Rouser's failure to receive the court's orders prejudiced his ability to allege violations of the 2011 Decree. The court's November 15, 2012 order instructed Rouser on the proper format under the local rules for submitting notices of additional violations. It also informed him that the court would disregard any noncompliant filings dated after October 9, 2012. Rouser had no way of knowing about this ruling. So he was unfairly denied the chance to re-file his flawed notices and effectively oppose the motion to vacate the consent decree.

Had Rouser submitted his notices in the proper format, the district court would have been confronted with a host of additional allegations of non-compliance. Rouser claimed in

---

filing of an order for the court's signature. In any case, the district court was well aware of Rouser's pro se status, as it signed and filed his 2012 attorney-substitution request identifying him as proceeding "pro se." Thus, despite knowing Rouser was pro se, the court delivered Rouser's copy of its orders to Bates as if he were still Rouser's attorney.

his several defective filings that defendants deprived him of the Wiccan bible in administrative segregation; prevented him from applying for the volunteer chapel clerk position; and continued to deny him direct access to the warden for his grievances. If true, each of these claims would have amounted to a material violation of the 2011 Decree.

Most troubling is the district court's cavalier response once it finally realized that Rouser had not been receiving its orders. Rouser, apparently unaware that the case was over, wrote to the court on April 12, 2013, explaining that he'd learned that all of the court's orders had been sent to his former counsel. Rouser claimed that he had been "effectively denied all due process and basically [had] been forced to fly blind." He specifically sought leave to appeal "[i]f the judge has granted the defendants' motion [to terminate the decree]" and requested the district court send him past orders. On the same day, he sent a letter addressed to the clerk's office, explaining that his former counsel left the case in 2006, that he was a "pro per plaintiff" and that he had not received orders from the court, which denied him "all due process." The docket does not reflect any response from either the court or the clerk's office to Rouser's letters.

On May 27, 2013, Rouser sent a strongly worded letter to the deputy state attorney general who served as counsel for defendants, with a copy to the court. In it, he declared that the court had "refused to send [him] any of its orders concerning this case . . . [w]hen it knows [he is] pro per and [has] been filing all motions and responses [himself]." Exasperated, Rouser wrote: "I am at a loss on how to get this court to send me copies of its orders . . . . I have [written to] the clerk as well and don't know if I need to go to someone

else or who else is it when the court will not send you rulings in your own case."

The court finally sent a copy of its order terminating the decree to Rouser on June 7, 2013. It declined to give Rouser additional time to oppose the now-moot motion to vacate, reasoning that Rouser already availed himself of the opportunity to respond to the motion. The court faulted *Rouser* for failing to keep it advised of his address and concluded that his failure to receive orders was due to his own oversight. The court, however, overlooked its own order of March 28, 2012 granting Rouser's request to proceed pro se and recording his address as the Lancaster prison. Rouser has remained at that prison since. The failure to effectuate Rouser's address change was thus the court's fault, not Rouser's.

This breakdown of communication between the court and Rouser is at loggerheads with the court's obligation to alert pro se litigants that they are entitled to submit evidence when the district court is about to resolve a dispositive motion. *Cf. Anderson* v. *Angelone*, 86 F.3d 932, 935 (9th Cir. 1996). And it stands on its head the "special solicitude" we consistently afford pro se prisoners due to the lack of control they have over their mail. *See Caldwell* v. *Amend*, 30 F.3d 1199, 1201 (9th Cir. 1994). To this day, there's nothing in the record indicating that anyone in the Central District of California has paused to question why so many returned orders are being docketed in this case. Rouser tried to bring the problem to the district court's attention in multiple filings, all to no

effect.[2]  This raises doubts as to whether the judge or anyone else paid sufficient attention to Rouser's pleadings.  Because of this failure, Rouser was denied a fair opportunity to contest defendants' motion to terminate the decree.

\*     \*     \*

We are disappointed by the district court's insouciance in this case.  The court committed numerous errors in terminating a consent decree that had been carefully crafted over the course of two decades.  The court applied the wrong legal standard and found substantial compliance without giving due attention to the various exacting obligations embodied in the decree, and without considering whether the purpose of the decree had been served.  The court improvidently refused to hold an evidentiary hearing to resolve material factual disputes about whether defendants had complied with the decree.  The court also encouraged noncompliance by finding that defendants had violated the consent decree, yet refusing to grant any meaningful relief.

In light of the court's own findings, only four months earlier, that defendants had failed to comply with material

---

[2] As discussed, in October 2012, Rouser filed a pleading indicating that he was only receiving notice of hearing dates from the "response filing of the defendants."  Then in April 2013, he wrote to the court and the clerk's office explaining that he was a pro se plaintiff and had not received the court's orders, and was thus deprived of due process.  When the district court and the clerk's office remained silent, Rouser sent a letter to opposing counsel with a copy to the court, saying that he was "at a loss on how to get [the] court to send [him] copies of its orders."  All of these communications were docketed and filed but had no effect until June 7, 2013, when the court eventually sent Rouser a copy of the order terminating the decree.

aspects of the decree, and with no proof that those failures had been remedied, termination of the decree was clearly an abuse of discretion. Under no circumstances should the district court consider terminating a decree unless and until there has been a substantial period of substantial compliance—in this case no less than a year—with every one of its terms.

The district court's protracted failure to correct Rouser's address, and its repeated failure to re-send notices of orders that had been returned as undeliverable, raises even broader questions. Bluntly stated, the record documented in Appendix A casts doubt on whether anyone in the Central District of California's Clerk's Office is paying attention to the important and sensitive process of providing parties with fair notice of the court's orders. How can it be that the district court failed to implement the change of address for the delivery of orders after granting Rouser's motion to proceed pro se, and then ignored almost two dozen orders that were returned to the court as undeliverable? Is the problem we note here limited to this case or does it reflect an absence of procedures designed to prevent and correct such errors in other cases? We find it inconceivable that a properly run clerk's office would permit this to go on over the course of years.

We therefore **VACATE** the district court's order terminating the consent decree, **REINSTATE** the 2011 Consent Decree and **REMAND** the case to the district court for further proceedings consistent with our opinion. Costs to Appellant.

## APPENDIX A

| *ORDER DATE & DOCKET NO.* | *DATE RETURNED & DOCKET NO.* | *ORDER CONTENTS* |
|---|---|---|
| March 15, 2012 Dkt. No. 548 | April 24, 2012 Dkt. No. 555 | In chambers notice regarding partial joint settlement statement |
| July 18, 2012 Dkt. No.  557 | July 26, 2012 Dkt. No. 583 | Order requiring further filings related to partial joint settlement statement |
| July 31, 2012 Dkt. No.  559 | August 24, 2012 Dkt. No. 562 | Order calendaring Rouser's motion to enforce consent decree |
| August 24, 2012 Dkt. No.  561 | September 10, 2012 Dkt. No. 583 | Order granting defendants' request to extend response time |
| August 30, 2012 Dkt. No.  563 | September 13, 2012 Dkt. No. 583 | In chambers order taking Rouser's motion to enforce consent decree under submission |
| September 19, 2012 Dkt. No.  566 | October 4, 2012 Dkt. No. 583 | Order requiring response from defendants to notice of further violations of consent decree |

| *ORDER DATE & DOCKET NO.* | *DATE RETURNED & DOCKET NO.* | *ORDER CONTENTS* |
|---|---|---|
| September 27, 2012 Dkt. No. 568 | October 22, 2012 Dkt. No. 583 | Order granting extension of time to defendants to respond to notice of further violations of consent decree |
| October 11, 2012 Dkt. No. 570 | October 25, 2012 Dkt. No. 583 | In chambers order taking notice of further violations of consent decree under submission |
| October 19, 2012 Dkt. No. 574 | December 7, 2012 Dkt. No. 580 | Order placing motion for injunction, evidentiary hearing and sanctions on court calendar |
| November 15, 2012 Dkt. No. 577 | December 18, 2012 Dkt. No. 581 | Order granting motion to enforce consent decree in part and instructing Rouser that future violations must be filed as separate motions |
| November 28, 2012 Dkt. No. 579 | December 7, 2012 Dkt. No. 582 | Order denying motion for injunction, evidentiary hearing and sanctions |
| February 1, 2013 Dkt. No. 585 | February 22, 2013 Dkt. No. 590 | Form order notifying defendants of deficiencies in their motion to vacate |

| ***ORDER DATE & DOCKET NO.*** | ***DATE RETURNED & DOCKET NO.*** | ***ORDER CONTENTS*** |
| --- | --- | --- |
| February 1, 2013 Dkt. No. 586 | February 22, 2013 Dkt. No. 591 | Form order striking deficient motion to vacate |
| March 13, 2013 Dkt. No. 594 | June 12, 2013 Dkt. No. 604 | Order granting motion to vacate |
| March 18, 2013 Dkt. No. 596 | March 25, 2013 Dkt. No. 598 | Order denying as moot Rouser's request for hearing on motion to vacate |
| June 21, 2013 Dkt. No. 605 | August 1, 2013 Dkt. No. 609 | Rouser's notice of appeal to the Ninth Circuit |
| July 1, 2013 Dkt. No. 607 | August 9, 2013 Dkt. No. 610 | Forwarding order from Ninth Circuit detailing appeal schedule and providing notice of past due docket fee |
| September 5, 2013 Dkt. No. 612 | October 16, 2013 Dkt. No. 615, 616 | Form order rejecting Rouser's motion to take judicial notice of perjury and fraudulent documents |
| October 15, 2013 Dkt. No. 614 | November 26, 2013 Dkt. No. 619 | Forwarding order from Ninth Circuit granting Rouser's motion to proceed in forma pauperis |

| *ORDER DATE & DOCKET NO.* | *DATE RETURNED & DOCKET NO.* | *ORDER CONTENTS* |
|---|---|---|
| November 19, 2013 Dkt. No. 618 | January 14, 2014 Dkt. No. 623 | Forwarding order from Ninth Circuit assessing initial partial filing fee |
| December 18, 2013 Dkt. No. 621 | January 27, 2014 Dkt. No. 624 | Forwarding order from Ninth Circuit denying Rouser's motion to take judicial notice of perjury and fraudulent documents |

CALLAHAN, Circuit Judge, dissenting:

In 1993, William Rouser filed suit against California state prison officials (Defendants), alleging that they had infringed his right to practice Wicca while incarcerated in violation of the Establishment and Equal Protection Clauses of the U.S. Constitution, among other laws. Twenty years later, the district court concluded that a court-approved settlement agreement (the Consent Decree) balancing Rouser's ability to practice Wicca with prison officials' need to maintain safe prisons had served its purpose. The court therefore vacated the Decree. We must decide whether the district court abused its discretion in determining that Defendants had substantially complied with the Decree.

The majority's reversal of the district court improperly denies the heightened deference due a trial court's finding that a consent decree aimed at institutional reform has served its purpose, is at odds with the Prison Litigation Reform Act (PLRA), and is undermined by a record showing compliance that is substantial. The majority rules that a party seeking to terminate a consent decree, including decrees involving federal-court intervention in state prisons, must demonstrate compliance with every one of a decree's provisions for a substantial period of time. This rule effectively requires full, not substantial compliance. The rule is contrary to our precedent and Congressional intent, and it thrusts federal courts beyond their institutional competence. I dissent.

## I.

Understanding the district court's determination that Defendants have substantially complied with the Consent Decree first requires understanding the Decree's contents and

the events preceding its vacatur. The majority does not explain the Decree's numerous provisions and instead focuses on, and incorrectly describes, the few provisions that Rouser says have been violated. The majority's failure to acknowledge the undisputed breadth of Defendants' compliance is not without irony given that the majority faults the district court for not addressing "*every one* of [the Decree's] provisions." Maj. Op. 10 (emphasis in original).

## A. The Consent Decree

Since Rouser initiated this lawsuit, the district court, among other things, approved a private settlement agreement in 1997, reopened the case in 2004 following Rouser's motion to enforce the settlement agreement, and granted Rouser a preliminary injunction in 2010. After Defendants noticed that they intended to appeal the district court's preliminary injunction order, the parties agreed to mediation and, in 2011, reached a court-approved settlement agreement that is the focus of this appeal.

The Consent Decree provides Rouser with access to listed personal religious items, including the Witches' Bible, the Book of Shadows, other religious literature, a deck of tarot cards, up to four ounces of listed oils, listed herbs, up to five one-inch stones or ten one-half-inch stones, four feathers, a pentagram or other approved Wiccan medallion, and one package of eighteen seashells not larger than one-half inch in diameter. While in administrative segregation or the security housing unit Rouser is allowed access only to the Witches' Bible, and only to the extent that prisoners of other religious faiths are allowed to have a religious text in those units. The Decree provides Rouser with access to a different set of items for group religious services, including candles and candle

holders, incense and incense holders, listed oils, water, salt, listed herbs, tarot cards, a drum, feathers, stones, seashells, a wood wand, a chalice or ritual cup, a small bell, a drum, an altar and altar cloth, and a small picture or statue of deities. While the Decree permits Rouser to use seven candles for group religious services, his access is subject to institutional safety and security concerns, including applicable fire safety regulations. Prison officials maintain custody and control over these group religious items while they are not in use.

The Consent Decree requires Defendants to provide Rouser with "reasonable opportunities to participate" in Wiccan events, including weekly services called Esbats, weekly religious study groups, and special religious services called Sabbats. In fulfilling these obligations, however, the Decree recognizes that Defendants also must "tak[e] into account factors such as the number of inmates, available space, safety and security, resources, and administrative considerations." Sabbats are held eight times a year, and prison officials are required to "use their reasonable efforts to schedule the Sabbats on the dates identified." If a Sabbat is cancelled for administrative reasons, prison officials must reschedule the Sabbat at the earliest practicable date. However, the Decree provides that officials will not reschedule a Sabbat cancelled because of inmate-caused safety or security concerns. The Decree requires Defendants to construct a fire pit and outdoor worship area, which Rouser may use during Sabbats. A volunteer Wiccan minister may attend and lead Wiccan services.

The Decree also includes provisions aimed at ensuring that prison officials treat Wicca similarly to how they treat other religions. For example, the Decree provides that the schedule, time, and location of Wiccan events will be posted

and announced in the same manner as other religious events and that Rouser may apply and be considered for an inmate work assignment as a clerk to the facility chaplain. The Decree requires prison officials to provide food for Sabbats to the extent that they provide food for special religious observances of other religious groups. Similarly, if prison officials allow inmates to bring food or canteen items to religious services and study groups, they will permit Rouser to bring comparable food or canteen items to weekly Wiccan services and study groups.

More generally, the Decree provides Rouser with an expedited inmate appeals process for appeals relating to noncompliance with the Decree. It also provides that prison officials may temporarily suspend the Decree's provisions in emergencies, for security reasons, or when Rouser is confined in administrative segregation or the secure housing unit. Finally, the Decree includes a termination provision stating that, one year after its filing, Defendants could move to vacate the decree, dismiss the action with prejudice, and enter judgment on the ground that the preponderance of the evidence shows they have substantially complied with the Decree.

In sum, the Consent Decree's central goal is to permit Rouser, like inmates of other faiths, to practice his religion while incarcerated consistent with prison officials' need to maintain safe, orderly prisons in the face of finite resources. Achieving this goal requires prison officials to permit Rouser reasonable access to the religious items, services, and facilities that are important to Wicca.

## B.  Post-Settlement Litigation

Defendants proceeded to fulfill their obligations under the Consent Decree after the district court entered it on October 18, 2011.  On March 8, 2012, the parties filed a joint status report describing Defendants' compliance.  The parties stated that Defendants had provided Rouser with access to all specified personal and group religious items, allowed Rouser to order additional religious items, progressed with construction of the fire pit, included Wiccan events in the master schedule for religious services and study groups, secured a volunteer Wiccan minister, and determined that there currently was not a chaplain clerk position open for application by Rouser or any other inmate.  Defendants permitted Rouser to attend Wiccan services and activities on a regular basis, though Rouser complained that "there have been several instances where services were not timely started or were otherwise canceled."  Rouser, however, acknowledged that he was able to avail himself of an expedited inmate appeals process to address his concern.

On July 26, 2012, Rouser, now proceeding pro se, filed the first of a series of documents with the district court seeking to compel Defendants' compliance with the Consent Decree.  He alleged that (1) a religious necklace had been damaged; (2) the December 2011 Yule Sabbat had been canceled due to a contraband-related "laundry sweep"; (3) weekly services had been "terminated indefinitely" for two weeks; (4) officers were "desecrating" religious items in their custody by touching them while dispensing them; (5) the outdoor religious area under construction had not been completed; and (6) he had twice been denied expedited prisoner appeals. In later filings, Rouser sought monetary damages and immediate release from administrative

segregation, where he alleged that he was placed due to "enemy concerns" related to a Protestant inmate. He also alleged that Defendants told him that he could not order candles and incense.

Defendants responded with declarations from prison staff. Defendants explained that, consistent with the Consent Decree, the Yule Sabbat was "canceled due to inmate-caused safety and security issues, specifically reports of contraband in the inmate laundry that precipitated a temporary lockdown of the prison facility." They explained that Wiccan weekly services were briefly suspended following a May 9, 2012 service during which "volunteers covered up windows in the chapel with inmates inside, restricting the view into the area, thereby creating a significant safety and security breach within the prison." The suspension was lifted two weeks later, immediately after the Wiccan volunteers returned and were further instructed on compliance with prison procedures. Defendants averred that Rouser's religious necklace, which is not listed among the group religious items kept by prison officials, was damaged while it was in his control. Defendants confirmed that they completed construction of the outdoor religious activity area and fire pit on August 21, 2012, and that Rouser had made use of the area since that time. Addressing Rouser's latter allegations, Defendants explained that Rouser was not denied access to either candles or incense, but acknowledged "some miscommunication concerning [his] access and use of an open flame during services" stemming from security concerns, which had been resolved.

On November 15, 2012, the district court consolidated most of Rouser's numerous filings and denied most of his

claims.[1]  The court began by noting that many of Rouser's allegations were "unclear, unsupported, or unrelated to the terms of the Decree."  The court found that prison officials had not violated the Decree by improperly cancelling services, noting that the officials provided evidence that services were properly cancelled because of security and safety threats.  The court found that prison officials had not denied Rouser access to an outdoor religious area or "desecrated" religious items by touching them, as they must in order to keep and dispense them.  The court acknowledged Rouser's allegation that a necklace had been damaged and other unspecified items had been stolen, and ordered prison officials to adhere to the terms of the Consent Decree "[t]o the extent religious items are under [their] control." Addressing the only uncontested violation of the Decree, the court ordered Defendants to provide Rouser with expedited inmate appeals concerning the Decree.

## C.  Vacatur of the Consent Decree

A few months later, on February 4, 2013, Defendants moved to vacate the Consent Decree.  In support of the motion, Defendants provided a declaration from Nathan Wilcox, a Correctional Counselor and Litigation Coordinator at the Lancaster Prison.  Wilcox attested to Defendants' "full compliance with the terms of the Consent Decree, including the construction of the outdoor religious area and Plaintiff's access to religious items."  Wilcox stated that Rouser had been provided access to the personal religious items set forth in the Decree, including "tarot cards, oils, herbs, stones,

---

[1] On November 28, 2012, the court issued a separate order denying Rouser's other outstanding motions because Rouser had failed to comply with the Consent Decree's exhaustion requirement.

feathers, and shells." Rouser also had received access to all religious group items for Wiccan services, and had "been permitted to order and purchase additional religious items." Esbats now were scheduled and held on a weekly basis with the assistance of a volunteer Wiccan minister, subject to institutional safety and security concerns. A fire pit and outdoor religious worship area had been constructed for Wiccan inmates' use. Wilcox explained that Wiccan inmates used the outdoor religious area for the Samhain Sabbat on October 31, 2012, and the Yule Sabbat on December 23, 2012. Defendants also submitted an October 18, 2012 memorandum requiring Wiccan service "to be announced in the same manner and to the same extent as announced for religious events of other religious groups," and detailing procedures for storage of group religious items and use of the outdoor religious area.

On February 21, 2013, Rouser opposed the motion to vacate, alleging that prison officials had only allowed him, in the absence of a volunteer chaplain, to complete one ritual at the outdoor religious ground since it was completed and to use one candle, instead of seven, for the 2012 Yule Sabbat.

On March 13, 2013, the district court granted the motion to vacate and entered judgment for Defendants. Citing to declarations by prison staff and "internal prison procedures setting forth approved Wiccan religious activities," the court ruled that Defendants had demonstrated by a preponderance of the evidence that they had substantially complied with Decree. The court explained that "[a]lthough it is not entirely clear from his Opposition, Plaintiff contends that Defendants have not complied with the settlement agreement in a handful of instances." The court concluded that, even assuming these

allegations to be true, they did not overcome Defendants'
showing of substantial compliance.

## II.

The district court's three-page order granting the motion
to vacate is terse. Indeed, if the majority simply vacated and
remanded for further explanation little ink would be spilled
in dissent.[2] However, the majority goes much further, rattling
off supposed errors like a gatling gun. In doing so, the
majority commits larger legal errors related to the standards
applicable to the termination of consent decrees governing
state prisons.

## A. We owe special deference to the district court's determination the Consent Decree has served its purpose.

We review the district court's grant of a motion to vacate
a consent decree for an abuse of discretion. *Jeff D. v. Otter*,
643 F.3d 278, 283 (9th Cir. 2011). While the abuse-of-
discretion standard is always deferential, the deference owed

---

[2] While terse, the district court's explanation is sufficient to allow for
meaningful judicial review. *See Husain v. Olympic Airways*, 316 F.3d
829, 835 (9th Cir. 2002) ("[I]f the district court's findings are plausible in
light of the record viewed in its entirety, the appellate court cannot reverse
even if it is convinced it would have found differently."). As elaborated
below, the largely uncontested declaration and prison procedures
referenced by the district court confirm that the court did not abuse its
discretion in finding substantial compliance. This case is therefore not, as
Rouser contends, like *Blue Cross & Blue Shield of Ala. v. Unity
Outpatient Surgery Center, Inc.*, 490 F.3d 718, 725 (9th Cir. 2007), where
we remanded because a district court's order was devoid of "any
discussion of the relevant factors or any indication of the basis for its
decision."

a district court's decision to terminate a consent decree governing institutional reform is heightened where, as here, the trial judge oversaw the decree for a significant period of time. *See Jeff D. v. Kempthorne*, 365 F.3d 844, 850 (9th Cir. 2004). A trial court in an institutional reform case is due special deference not only because of its familiarity with any progress toward compliance and past instances of non-compliance, but also because of its better understanding of the challenges that might make more perfect compliance unrealistic. For example, in overseeing a decree governing the management of state prisons, the trial court "develop[s] an understanding of the difficulties involved in . . . managing a jail that an appellate court, even with the best possible briefing, could never hope to match." *Rufo v. Inmates of Suffolk Cty. Jail*, 502 U.S. 367, 394 (O'Connor, J., concurring); *see also Hutto v. Finney*, 437 U.S. 678, 688 (1978) (providing "special deference because of the trial judge's years of experience with the problem at hand and his recognition of the limits on a federal court's authority in a case of this kind").

The majority initially errs by denying special deference to the district court's determination that the Consent Decree has served its purpose, reasoning that the district court handled the case for "only two years." Maj. Op. 8. But even assuming that a district court must oversee a consent decree for some threshold amount of time before deference is due, two years of managing a decree is more than enough. This case's history demonstrates that the district court is far better positioned than we are to determine if Defendants have substantially complied with the Decree. As noted, the district court decided to grant the motion to vacate not long after granting in part and denying in part Rouser's motion to enforce. The district court was thus very familiar with the

challenges facing prison officials' compliance, the steps that Defendants had made toward achieving full compliance, and the nature of Rouser's remaining allegations of non-compliance.

That the district court's experience supervising the Decree for two years is enough to merit deference is also supported by the PLRA, pursuant to which the Consent Decree was entered. The PLRA provides that, after two years, consent decrees providing prospective relief with respect to prison conditions are "terminable upon the motion of any party or intervener," unless "the court makes written findings based on the record that prospective relief remains necessary to correct a current and ongoing violation of the Federal right" at issue. 18 U.S.C. § 3626(b)(1), (3). If consent decrees are presumptively terminable after two years under the PLRA, it follows that two years of supervising a decree is a sufficient amount of time for a trial judge to acquire the expertise needed to determine whether a decree's purpose has been served.

Of course, we don't need Congress to tell us that two years is a substantial amount of time. Common sense tells us so. Two years is the term of a member of the House of Representatives, for example. Indeed, we classify crimes punishable by two years imprisonment as felonies because that is a substantial amount of time. The majority errs by refusing to accord "substantial deference to 'the trial judge's years of experience with the problem at hand.'" *Rufo*, 502 U.S. at 394 (O'Connor, J., concurring) (quoting *Hutto*, 437 U.S. at 688).

## B. The district court did not abuse its discretion in vacating the Consent Decree.

Giving the district court the special deference it is owed, I cannot agree with the majority that the district court abused its discretion in vacating the Consent Decree. "A district court abuses its discretion if it does not apply the correct law or if it rests its decision on a clearly erroneous finding of material fact." *Casey v. Albertson's Inc.*, 362 F.3d 1254, 1257 (9th Cir. 2004). Rouser has demonstrated neither of these conditions.

### 1. The district court did not fail to observe any procedure required for terminating consent decrees. Rather, the majority creates a rule that is inconsistent with our case law and the PLRA.

The majority first faults the district court for failing to observe procedure that the majority rules courts must follow in deciding whether to vacate a consent decree. According to the majority, a court faced with a motion to terminate a consent decree must first determine whether the basic purposes of the decree have been met, and then must determine whether the party seeking release from the decree has "substantially complied with *every one* of its provisions" for a "substantial period." Maj. Op. 10, 11–12, 13, 19.

The majority's "substantial period of substantial compliance with every term" invention is inconsistent with our case law and at odds with the PLRA. The majority attributes its rule to "the teachings of *Otter*." Maj. Op. 9. But *Jeff D. v. Otter*, 643 F.3d 278 (9th Cir. 2011), created no such rule. In *Otter*, we faulted the district court for employing "the contempt burden and standard of proof" in determining

whether "substantial compliance [permitted] consent decrees to be vacated." *Otter*, 643 F.3d at 287. We also directed the district court, on remand, to consider whether "the larger purposes of the decrees have been served," rather than focusing myopically on whether individual "Action Items" had been completed. *Id.* at 288. This direction is consistent with our other decisions, which emphasize that substantial compliance does not mean that "every last wish and hope of the decree [has been] achieved, but [that] the decree accomplished its *essential purposes* and the situation improved greatly." *Labor/Cmty. Strategy Ctr. v. Los Angeles Cty. Metro. Transp. Auth.*, 564 F.3d 1115, 1123 (9th Cir. 2009) (emphasis added). The majority's rule requiring a substantial period of substantial compliance with every term violates this precedent.

The majority's rule, which effectively requires full rather than substantial compliance, is particularly inappropriate in cases involving federal oversight of a state prison. Its rule is in tension with the general "principle that federal court intervention in state institutions is a temporary measure and may extend no longer than necessary to cure constitutional violations." *Id.* (citing *Bd. of Ed. of Okla. City Pub. Sch. v. Dowell*, 498 U.S. 237, 248 (1991); *Toussaint v. McCarthy*, 801 F.2d 1080, 1087 (9th Cir. 1986)). The majority's rule is also inconsistent with the PLRA, which we have recognized was "intended . . . to revive the hands-off doctrine" regarding federal judicial intervention in prisons. *Gilmore v. California*, 220 F.3d 987, 997 (9th Cir. 2000). Under the PLRA, a court must terminate a consent decree after two years in the absence of a "current and ongoing violation" of

an asserted federal right.[3] 18 U.S.C. § 3626(b)(3). "In other words, if a violation no longer exists, the statute does not permit the court" to refuse to terminate the Decree. *Hallett v. Morgan*, 296 F.3d 732, 743 (9th Cir. 2002).

Accordingly, the majority's rule requiring substantial compliance with every provision for a substantial period of time has no place under our precedent or the law. Nor is its rule obligating district courts to examine in detail past instances of non-compliance that are not ongoing consistent with applicable law in prison-reform cases. Rather, our precedent and California law direct courts to consider "whether the larger purposes of [consent] decrees have been served" in deciding whether their vacatur is justified due to substantial compliance. *Otter*, 643 F.3d at 287; *see Labor/Cmty. Strategy Ctr.*, 564 F.3d at 1122 ("Our analysis requires we do more than simply count the number of technical deviations from the decree. Instead, we must determine, using a holistic view of all the available information, whether [defendant's] compliance with the Decree overall was substantial, notwithstanding some minimal level of noncompliance."). And in deciding whether prospective relief remains merited in a case aimed at reform of a state prison, federal courts should "give substantial

---

[3] Rouser accepts that this requirement applies to the district court's termination of the Consent Decree, but argues that the PLRA requires evidentiary hearings and written findings before a district court *terminates* a consent decree governed by the PLRA. This position is contrary to § 3626(b)(3)'s plain language, our precedent, and decisions of our sister circuits. *See, e.g.*, *Hallett*, 296 F.3d at 743; *Cagle v. Hutto*, 177 F.3d 253, 258 (4th Cir. 1999); *see also Guajardo v. Tex. Dep't of Criminal Justice*, 363 F.3d 392, 397 (5th Cir. 2004).

weight to any adverse impact on public safety or the operation of a criminal justice system." 18 U.S.C. § 3626(a)(2).

Here, the district court satisfied these requirements by recognizing that the underlying purpose of the Consent Decree was to provide for Rouser's "ability to practice Wicca while incarcerated." The majority does not explain why this description of the Decree's goal is inadequate or even attempt to provide a better description. The district court then found that Defendants' largely uncontested declarations and memorandum regarding prison procedures demonstrated, by a preponderance of evidence, that Defendants have substantially complied with the Decree. In so holding, the district court did not violate any court-mandated procedure for resolving motions to vacate consent decrees.

Nor did the district court err, as the majority alternatively holds, by finding substantial compliance without conducting an evidentiary hearing. The majority relies on *Gilmore v. California*, but that case only held that a district court must "take evidence on the current circumstances at the prison . . . with respect to those remedies as to which plaintiffs did not concede that defendants were in compliance." 220 F.3d at 1010. Here the district court took and considered evidence on current circumstances presented by both parties and assumed Rouser's evidence as true. The district court did not, as the majority incorrectly states, "simply examine the existing record." Maj Op. 13–14 (quotation marks and alteration omitted). The majority fails to understand that the act of taking evidence includes taking declarations and other new evidence, and is not limited to live hearings.

Neither our precedent nor the terms of the Consent Decree required more. *See, e.g.*, *Stewart v. Cate*, 757 F.3d 929, 942 (9th Cir. 2014) (holding that a district court did not abuse its discretion in denying a request for an evidentiary hearing where newly presented evidence requiring a credibility assessment was assumed true). In fact, under the PLRA, neither evidentiary hearings nor written findings based on the record are required where a federal court determines that the consent decree governing state prisons should terminate. 18 U.S.C. § 3626(b)(3); *Cagle*, 177 F.3d at 258 ("The plain language of § 3626(b)(3) imposes no requirement that a district court conduct an evidentiary hearing in order to determine whether there is a current and ongoing violation of federal rights.").

### 2. The district court did not use an incorrect standard for substantial compliance.

The majority also faults the district court for "applying the wrong legal standard for substantial compliance." Maj. Op. 11. The majority claims that the district court equated substantial compliance with "significant steps to follow the settlement agreement." *Id.* Rouser, who is now represented by a major law firm, did not make, and thus waived, this argument, which unfairly characterizes the district court's decision.[4] Consistent with the Consent Decree's termination

---

[4] Without providing any supporting precedent, Rouser incorrectly faults the district court for "fail[ing] to define substantial compliance." The district court was under no obligation to define substantial compliance. In fact, the court had no need to clarify its meaning in light of the parties' agreement that California law governs the term. The parties agree that, under California law, substantial compliance does not require "literal compliance," it requires that "the defects of performance must not pervade the whole or be so essential as substantially to defeat the object which the

provision, the district court placed the evidentiary burden on Defendants, and found that they had "demonstrated by a preponderance of the evidence that they have substantially complied with the terms of the [Decree]."  The reference to "significant steps to follow the settlement agreement" simply indicates that Defendants have diligently worked to achieve compliance with the Decree, as detailed in their mostly uncontested filings.   The district court concluded that Defendants' evidence established that they "have substantially complied with the settlement agreement."

### 3.  The district court did not clearly err in finding that a preponderance of the evidence showed substantial compliance with the Consent Decree.

The majority also holds that the district court's substantial compliance determination is based on a clearly erroneous factual finding.  Under the abuse of discretion standard, "if the district court's findings are plausible in light of the record viewed in its entirety, the appellate court cannot reverse even if it is convinced it would have found differently." *Husain*, 316 F.3d at 835.   Again, this standard is even more deferential where, as here, we review a district court's determination that a consent decree aimed at institutional reform has served its purpose. *Labor/Cmty. Strategy Ctr.*, 564 F.3d at 1121.

Applying these rules to the record presented compels me to conclude that the district court did not abuse its discretion in finding that Defendants had substantially complied with the Consent Decree.  As noted, the district court found that

---

parties intend to accomplish." *Connell v. Higgins*, 170 Cal. 541, 556 (1915); *see also Labor/Cmty. Strategy Ctr.*, 564 F.3d at 1122.

"declarations from prison staff, outlining the various actions taken to comply with the settlement agreement" and "internal prison procedures setting forth approved Wiccan religious activities" demonstrated Defendants' substantial compliance with the Decree. The Wilcox declaration explained that (1) Rouser had been provided access to the personal and religious group items listed in the Decree; (2) Wiccan group services were scheduled and held on a weekly basis with the assistance of a volunteer Wiccan minister, subject to institutional safety and security considerations; (3) a fire pit and outdoor religious worship area had been constructed for Wiccan inmates' use; and (4) Wiccan inmates used the outdoor religious area for the "Samhain sabbat on October 31, 2012 and the Yule sabbat on December 23, 2012." The referenced prison procedures, among other things, (1) provide that Wiccan "services shall be announced in the same manner and to the same extent as announced for religious events of other religious groups"; (2) explain that the group religious items listed in the Consent Decree "are to be secured in the Facility Chapel"; and (3) establish rules for use of the outdoor religious area.

In response to Defendants' proffer of compliance with the Decree, Rouser alleged two relevant instances of non-compliance.[5] He alleged that prison officials had (1) only allowed him, in the absence of the volunteer chaplain, to use one candle, instead of seven, for the Yule 2012 Sabbat; and

---

[5] Like his earlier motion to enforce, Rouser's opposition to the motion to vacate focused in large part on his placement in administrative segregation due to enemy concerns related to other inmates. As the district court implicitly acknowledged in its earlier order on Rouser's motion to enforce, these allegations are "unclear" and "unrelated" to the Consent Decree. The majority appears to agree and does not address these allegations.

(2) only allowed him, in the absence of the volunteer chaplain, to complete one ritual at the outdoor religious ground since it was completed a few months earlier. The district court determined that, even accepting these allegations that Defendants "have not complied with the [Decree] in a handful of instances" as true, they do not refute Defendants' showing of substantial compliance.

The record does not show that this finding was clearly erroneous. Rouser did not contest most of Defendants' sworn declaration stating that Defendants had fully complied with the Decree. Accordingly, the district court could take as true that Defendants complied with the Consent Decree except as to those provisions disputed by Rouser. The majority incorrectly treats all provisions in the Consent Decree not specifically addressed by Defendants as having been insufficiently evidenced. However, Defendants were not required to list out and address every line of the Consent Decree separately, and the majority errs by faulting the district court for not holding Defendants to such a requirement. A district court need not take evidence regarding provisions of a consent decree governing a state prison with which a plaintiff concedes defendants have complied. *See Gilmore*, 220 F.3d at 1010; 18 U.S.C. § 3626(b)(3).

There is therefore no dispute that, for example: volunteer Wiccan ministers now may attend and lead Wiccan services; weekly Esbats are now permitted; weekly Wiccan study groups are now permitted; an outdoor religious area and fire pit have been constructed for Wiccan inmates, which inmates had already used during Sabbats; Wiccan services now are posted and announced in the same manner as other religious events; Wiccan inmates are permitted to order food for

Sabbats and bring food to weekly Esbats and study groups; Rouser has been allowed to order and possess all of the personal religious items listed in the Decree; and Rouser may apply and be considered for an inmate work assignment as a clerk to the facility chaplain.

Additionally, it is apparent that there is no dispute that Rouser has been permitted to order and access the full list of group religious items. The single exception, according to Rouser, was that, during one Sabbat, he was only allowed access to one candle instead of seven in the absence of the volunteer chaplain.[6] While the Decree permits Rouser to use seven candles for group religious services, subject to "institutional safety and security concerns," the alleged non-compliance with this provision for a single service does not undermine Defendants' showing of substantial compliance. Indeed, Rouser has not alleged that he was denied access to *any* group religious item for *any* weekly Esbat or *any* other Sabbat.[7]

---

[6] In one part of his opposition, Rouser alleges more generally that he was not permitted to order candles, incense, or associated holders. This allegation, however, is contradicted by Rouser's subsequent allegation that he was denied *access* to more than one candle (with no mention of incense) and only during the 2012 Yule Sabbat. Indeed, Rouser does not dispute that he was permitted to use candles and incense during other Sabbats and weekly Esbats. It follows that he has been permitted to order candles, incense, and associated holders.

[7] It is notable that the only items that have been of concern are those involving open flames, which raise obvious prison-safety concerns. Indeed, in responding to Rouser's same claim in his motion to enforce regarding candles and incense, Defendants explained that Rouser was not denied access to either candles or incense, but acknowledged "some miscommunication concerning [his] access and use of an open flame during services" stemming from security concerns, which had been

Rouser's other allegation of non-compliance—that he was only allowed to complete one ritual at the outdoor religious ground since it was completed a few months earlier—does not undermine Defendants' showing of substantial compliance either. There were three Sabbats since the beginning of October—the Samhain Sabbat on October 31, the Yule Sabbat on December 23, and the Imbolg Sabbat on February 2. Before the Imbolg Sabbat had come to pass, Defendants declared under penalty of perjury that inmates used the outdoor religious area for the Samhain Sabbat and the Yule Sabbat. Thus, it appears that Rouser's concern is either with the Imbolg Sabbat or that, while Rouser accessed the outdoor religious area during the Yule Sabbat, he could not appropriately observe the event because he was denied access to the requisite number of candles. Regardless, Rouser acknowledged that he was unable to use the outdoor religious area because the Wiccan volunteer chaplain was not available to supervise the event.

Even accepting Rouser's allegation as true, the fact that he could not use the outdoor religious area due to the absence of the volunteer chaplain during one Sabbat does not necessarily demonstrate even an isolated violation of the Consent Decree. The Decree acknowledges that, in providing Rouser "reasonable opportunities to participate in Wiccan group religious services," prison officials must "tak[e] into account factors such as the number of inmates, available

---

resolved. Prison officials should, consistent with safety and administrative considerations, respect a Wiccan inmate's interest in using candles for Wiccan services to the same extent that inmates of other religions are permitted to use candles for their services. It is likely unreasonable, however, to expect prison officials to be able to supervise the use of candles by Rouser and all other inmates every week of the year and on every Sabbat.

space, safety and security, resources, and administrative considerations, so long as those factors are also considered in determining the access of other religious groups to regularly scheduled group religious activities." Moreover, Defendants' prison procedures memorandum governing the use of the outdoor religious area makes clear that a volunteer or other staff must be available to escort inmates to the event.

Indicative of its commitment to riddle the district court's exercise of discretion with as many holes as possible, regardless of their merit, the majority goes beyond the allegations of non-compliance made by Rouser in his opposition to the motion to vacate. First, the majority faults the district court and Defendants for not addressing a provision of the Consent Decree that *does not exist*. The majority says that Defendants should have addressed Rouser's "right to be released from confinement in time to attend full Wiccan services." Maj. Op. 12. The Decree contains no such provision. In fact, the Decree allows prison officials to *suspend* its provisions "when Rouser is confined in Administrative Segregation."

Second, the majority faults Defendants for not addressing issues that they addressed. For example, the majority faults Defendants for not explaining whether they had made "copies of a master schedule of religious services that included the time and location of Wiccan events." However, Rouser himself acknowledged in a joint status report that Defendants had included Wiccan events in the master schedule for religious services and study groups, as required. Moreover, the prison procedures memorandum states that "services shall be announced in the same manner and the same extent as

announced for religious events of other religious groups.**[8]** As with the vast majority of other provisions in the Consent Decree, there is simply no dispute that Defendants have complied with this requirement.

Third, the majority faults the district court for not mentioning past instances of non-compliance with the Decree. As explained above, past instances of non-compliance are of questionable relevance in deciding whether to vacate a consent decree entered under the PLRA, which requires an "ongoing violation of the Federal right" for relief to be continued after two years. *See* 18 U.S.C. § 3626(b)(3); *Hallett*, 296 F.3d at 743. In any case, the majority wrongly concludes that the district court's decision on the motion to enforce undermines the same court's decision on the motion to vacate. The district court did not find that prison officials had damaged Rouser's necklace. Instead, it ordered prison officials to adhere to the terms of the Consent Decree "[t]o the extent religious items are under [their] control." Indeed,

---

**[8]** The majority's dismissal of evidence such as the prison procedures memorandum and the joint status report as "stale" illustrates how far the majority oversteps its role as a reviewing court. This evidence was not stale—the prison procedures memorandum was less than five months old and the joint status report was a year old when the district court vacated the Decree. Combined with Defendants' declarations, this evidence confirmed, as Rouser *did not dispute* in opposition to the motion to vacate, that all or nearly all of the Decree's provisions had been achieved. Moreover, the majority does not appreciate the difference between past, now-corrected instances of non-compliance and past acts achieving compliance. While corrected instances of non-compliance are of questionable relevance under the PLRA, which requires an "ongoing violation of the Federal right" for relief to be continued, 18 U.S.C. § 3626(b)(3), a district court obviously may look into the past in assessing whether a decree's objectives, such as commitments to construct fire pit and allow access to spiritual leaders, have been accomplished.

a "religious necklace" is not a listed item in the Consent Decree. To the extent that the necklace in question is the medallion or pentagram, it is listed as a personal religious item, which the Decree states that Rouser possesses.

The only uncontested violation of the Decree alleged in the motion to enforce was Defendants' failure to provide Rouser with expedited inmate appeals on a few occasions. However, this procedural failure did not undermine the purpose of the Decree. The Decree's purpose is to provide Rouser with access to religious items, services, spiritual leadership, and facilities that are important to Wicca, not to provide Rouser with expedited inmate appeals. The majority fails to appreciate the difference between a procedural mechanism and a "larger purpose" of a decree. *See Otter*, 643 F.3d at 287; *see also Labor/Cmty. Strategy Ctr.*, 564 F.3d at 1123.

On the record presented, the district court did not clearly err in finding that Rouser's allegations that Defendants had failed to comply with the Decree in a "handful of instances" did not undermine Defendants' showing of substantial compliance. The alleged "defects of performance [do] not pervade the whole." *Connell*, 170 Cal. at 556. Nor are they "so essential as substantially to defeat the object which the parties intend to accomplish." *Id.* Instead, "the larger purposes of [the Consent Decree has] been served," *Otter*, 643 F.3d at 287, "and the situation improved greatly." *Labor/Cmty. Strategy Ctr.*, 564 F.3d at 1123. Like inmates of other religions, Rouser now has access, consistent with prison security and administrative considerations, to religious items, services, spiritual leadership, and facilities that are important to his faith. It certainly cannot be said that extending the

Decree is necessary to correct an ongoing violation of Rouser's rights under federal law.

### 4. Rouser has not been deprived of due process, as he concedes.

The final reason the majority gives for reversal is that the district court violated Rouser's due process rights by sending several orders to Rouser's former counsel instead of Rouser. This argument was not raised by Rouser on appeal and was therefore abandoned. *Wilcox v. Comm'r*, 848 F.2d 1007, 1008 n.2 (9th Cir. 1988). Indeed, it is the majority that demonstrates "insouciance" by jumping to name-calling without having heard from the parties about due process concerns.

As an initial matter, the majority inappropriately pins all of the blame for the misdeliveries on the district court. Rouser's previous attorney moved to withdraw as counsel in 2006, citing irreconcilable differences, including Rouser's propensity to pepper the court with unauthorized filings. After a hearing, the district court granted the motion to withdraw subject to submission of "an order for the court's signature." The district court subsequently reminded the parties that "[t]he court indicated its intent to grant this motion and directed plaintiff's counsel to file a proposed order." Neither Rouser nor his former counsel ever filed the requisite order and thus none was entered. Accordingly, the majority faults the district court for sending court orders to a counsel whose motion to withdraw was never granted and who thus continued to be listed as Rouser's counsel.

Moreover, Rouser was represented by attorneys at a major law firm from April 21, 2007, until March 28, 2012. During

this time, and certainly before withdrawing, Rouser's counsel could have notified the court that the docket should not list Rouser's previous attorney as a counsel of record. Even if the former counsel's ongoing listing as a counsel of record was not apparent then, Rouser should have notified the district court of any problem earlier once it became apparent. The majority states that Rouser clearly did so in October 2012. However, the filing that the majority references only requests that "the court send him the ruling of the hearing of 10/5/12 for plaintiff is pro per and the only way he has been finding out about the hearing dates is from the response filing of defendants." The import of this single sentence of a stream-of-consciousness letter focused on unrelated issues, if clearer now in hindsight, was undoubtedly less than obvious back then. Rouser did not clearly notify the district court of the delivery problem until April 24, 2013. Thereafter, on June 7, 2013, the district court entered an order acknowledging that Rouser had been proceeding pro se and directing the clerk to send Rouser the order vacating the Consent Decree that Rouser requested.

Even if the district court's failure to send documents to Rouser is partially attributed to the court and somehow constituted an error of constitutional magnitude, the district court correctly concluded that Rouser suffered no prejudice. Rouser received Defendants' motion to vacate, learned of the court's earlier order on his motion to enforce, and timely filed an opposition to the motion to vacate. Rouser has not alleged any prejudice.

The majority nonetheless contends that "Rouser's failure to receive the court's orders prejudiced his ability to allege violations of the 2011 Decree." Maj. Op. 15. The majority reasons that the docket error left Rouser in the dark about the

requirements that must be met before submitting notices of violations of the Decree, which the majority says were set forth in the district court's November 14, 2012 order denying Rouser's motion to enforce. The majority's argument fails for several reasons. First, it is not clear that Rouser did not actually obtain the November 14, 2012 order. Second, the order did not create any new filing requirements, it only referenced the Consent Decree's exhaustion provision. As the district court noted, the Consent Decree requires that "allegations that Defendants violated the Decree must follow the administrative procedures outlined in the Decree before being brought to this Court." Rouser was well aware of these requirements, having agreed to the Consent Decree, and thus suffered no prejudice even if he did not obtain the order.

Third, the subsequent allegations made by Rouser do not demonstrate that the district court erred in vacating the Consent Decree.[9] Rouser's allegation that he was denied the Witches' Bible while in administrative segregation may be concerning, but Rouser did not repeat this allegation in opposing the motion to vacate. Moreover, the Consent Decree only requires prison officials to permit Rouser access to the Witches' Bible to the extent that prisoners of other religious faiths are allowed to have a religious text while in administrative segregation. Rouser has never alleged that other prisoners are allowed such texts. Nor did Rouser repeat

---

[9] The majority's lists of filings that the district court failed to address and orders that Rouser didn't receive are inaccurate. The district court addressed Rouser's March 13, 2013 oral argument request, which the majority describes as alleging a violation of the expedited appeal provision, in a March 18, 2013 Order. Appendix A incorrectly lists Rouser as not having received the Court's March 15, 2012 Order. However, Rouser was represented by counsel at the time that Order was filed, and his counsel received the Order.

his unclear allegation regarding applying for a volunteer chapel clerk position. In any case, this provision does not guarantee that Rouser will be selected for the chaplain clerk position, but only allows him "to apply and be considered for such an assignment." In a joint status report, Rouser had previously acknowledged that Defendants had determined that there currently was not a chaplain clerk position open for application by Rouser or any other inmate.

Thus, even if Rouser had made a due process argument, and even if the district court had made a due process error, Rouser suffered no prejudice.

## III.

The district courts's finding of substantial compliance was not clearly erroneous or based on an incorrect legal standard. The majority, however, imposes a standard for terminating consent decrees that is inconsistent with our precedent and federal courts' limited role in overseeing reform of state prisons. The majority also overreaches our role as an appellate court by refusing to provide the district court the special deference that it is due in this case and offhandedly dismissing evidence that the trial court found compelling.

The record shows that the basic purpose of the Consent Decree has been achieved. Prison officials now permit Rouser, like inmates of other faiths, to practice his religion while incarcerated, consistent with security and administrative considerations. Rouser has reasonable access to the religious items, services, spiritual leadership, and facilities that are important to his faith. Prison officials provide Wiccan events with resources comparable to those

provided for events of other religions, such as publicity, food, and staffing.  While strictly observing any faith, particularly one involving many rituals, is undoubtedly difficult for an inmate, whose rights are not coextensive with those of the general public, Rouser's ability to observe Wicca is greatly improved.  It is time for this twenty-three-year-old case to be dismissed.  Accordingly, I dissent.